UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RONALD A. BROWN,

                Petitioner,                Case No. 1:08-cv-591

v.                                                Honorable Robert J. Jonker

RICK JANSEN,

                Respondent.
_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Promptly after the filing of a petition for habeas corpus, the Court must undertake a preliminary review of the petition to determine whether "it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court." Rule 4, RULES GOVERNING § 2254 CASES; *see* 28 U.S.C. § 2243. If so, the petition must be summarily dismissed. Rule 4; *see Allen v. Perini*, 424 F.2d 134, 141 (6th Cir. 1970) (district court has the duty to "screen out" petitions that lack merit on their face). A dismissal under Rule 4 includes those petitions which raise legally frivolous claims, as well as those containing factual allegations that are palpably incredible or false. *Carson v. Burke*, 178 F.3d 434, 436-37 (6th Cir. 1999). After undertaking the review required by Rule 4, I recommend that the petition be dismissed for lack of merit in the grounds presented.

**Discussion**

I.  Factual allegations

Petitioner Ronald A. Brown presently is incarcerated with the Michigan Department of Corrections and housed at Camp Branch. He pleaded guilty to armed robbery, MICH. COMP. LAWS § 750.529, unlawfully driving away an automobile, MICH. COMP. LAWS § 750.413, and two counts of possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b. On June 3, 1992, he was sentenced to concurrent terms of imprisonment of four to twenty years and one to five years on the first two counts and two terms of two years on each of the felony-firearm offenses, to run consecutively to each of the other offenses. At this time, he has been discharged on the offense of unlawfully driving away an automobile and on one count of felony-firearm, as he has completed his maximum sentences on those offenses.

Petitioner has been paroled on three occasions. In his petition, he complains that his third parole revocation was unconstitutional, as he was not guilty of having committed the parole violation of which he was found guilty on December 7, 2004. Because the parole violation involved the possession of a firearm, under Michigan parole procedures, Petitioner is not eligible for parole for five years.

According to the transcript of the parole hearing, on October 22, 2004, Parole Officer William Switzer and about five other law enforcement officers went to Petitioner's mother's house, where Petitioner was living following his release on parole. (Pet., App'x A, Hrg. Tr. at 4-5, docket #1-3.) Plaintiff was at work when the officers arrived. Switzer testified that Petitioner's mother answered the door. (*Id.* at 5.) Switzer introduced himself as Petitioner's parole officer and explained that he was there to search the area of the home over which Petitioner exercised control.

Petitioner's mother allowed the officers into the home. When he got inside, Switzer asked Petitioner's mother and his step-brother, Gregory McCrimon, whether there were any offensive weapons or illegal substances in the home. (*Id.*) The two residents advised Switzer that there was a rifle upstairs in Petitioner's bedroom. Switzer and another officer went upstairs and found an unloaded .22 caliber rifle in a metal case under the bed in the room in which they understood Petitioner slept. They found no ammunition in the room. (*Id.*) The officers took the rifle and turned it over to the Detroit Police Department. (*Id.*) As they left, they told Petitioner's mother to have Petitioner report to the parole office on the following Monday. (*Id.*) Switzer testified that, while it appeared that someone was living in the space, they did not investigate whether there was anything in the room to indicate that the occupant was Petitioner. (*Id.* at 5, 9.) According to Switzer, when he spoke with Petitioner following his arrest, Petitioner told Switzer that he slept on the couch downstairs and that the downstairs was his area of immediate control. He denied knowing that the rifle was in the room upstairs. (*Id.* at 8.) Switzer testified that Petitioner's step-brother, Mr. McCrimon, stated that the rifle belonged to him but that the brothers shared it. Switzer acknowledged, however, that he did not put McCrimon's statement in his report. (*Id.* at 8-9.) Switzer also acknowledged that, since shortly after his parole in June 2003, Petitioner had been steadily employed, had participated in a drug treatment program, had no parole infractions, and had never had a urine sample test positive for controlled substances. (*Id.* at 39.)

On Monday, Petitioner went to the parole office. Switzer was not present at the time, but Switzer's supervisor, Tracie Vaught, took Petitioner into custody. Vaught spoke with Petitioner at that time. She testified at the parole hearing that Petitioner "indicated to me that, he knew the rifle was there and he knew it was wrong." (*Id.* at 12.) Vaught further testified that Petitioner had

offered no other information.  (*Id.*)  At some point, Vaught received a telephone call from Petitioner's step-brother, Mr. McCrimon, who inquired about the process of the parole violation and wondered when he could retrieve his rifle.  Mr. McCrimon told Vaught that the rifle was his, not his brother's.  He also tried to explain Petitioner's efforts to conform with the conditions of parole.  According to Vaught, McCrimon did not say whether Petitioner had knowledge of the rifle, and Vaught had been told by Petitioner himself that he knew the weapon was in the home.  (*Id.* at 13.)

Three witnesses testified for the defense: Petitioner's step-brother, Gregory McCrimon, Petitioner's mother, Brenda McCrimon, and Petitioner.  Gregory McCrimon testified that he was living in the home and present on the day of the search.  (*Id.* at 16.)  When the officers asked to search and in response to the officers' questions about guns, Mr. McCrimon told them that he had a permit to carry a gun and that his .22 caliber rifle was present in the house.  He told the officers the gun was unloaded and that it was upstairs, either under his old bed or in his closet.  (*Id.* at 17-18, 20.)  McCrimon also told them that he had acquired the gun while living in another residence.  (*Id.* at 18.)  Mr. McCrimon denied ever having told the police that the gun belonged to both his brother and himself.  (*Id.* at 20.)  When he told the officers that the weapon was in the house, they wanted Mr. McCrimon to take them to it.  He then took them upstairs, where they retrieved the gun and began looking through all of the family possessions that were in the upstairs attic space.  (*Id.* at 18-19.)  According to Mr. McCrimon, the house was a bungalow, with no real second floor.  Instead, the upstairs space was an unfinished attic space that the family was attempting to finish.  (*Id.* at 19.)  Mr. McCrimon testified that his brother slept downstairs on the couch, had never to his knowledge had gone to the attic, and had no knowledge that the gun existed.  (*Id.* at 20-21.)  Mr. McCrimon asked Switzer why he was taking his gun, as it was legal and

McCrimon had a permit for it. Switzer told Mr. McCrimon that it was illegal for a felon to live in the house with a gun, and McCrimon told Switzer that he had not known that. (*Id.* at 21.) McCrimon testified that he understood that the police were taking his gun in order for his brother to stay in the house, and he voluntarily agreed to give up the gun. (*Id.* at 22, 24.) Mr. McCrimon explained that he was living away from the home and engaged to be married when Petitioner was still locked up. When his engagement broke off, he moved back into his mother's house, and brought the gun with him. (*Id.* at 21.) Petitioner had just been released out on his second parole when McCrimon moved back into the house. (*Id.* at 23.) He testified that the bed in the attic was his childhood bed, and that he had purchased a new one and moved the old bed to the attic. (*Id.* at 22.)

Brenda McCrimon testified that she was watching television when the officers arrived at her house to perform the search on Octobr 21, 2004. Her son Gregory answered the door. (*Id.* at 25-26.) After the officers had come into the house, Brenda McCrimon asked what the they were there for, and they told her they were conducting a parole search. (*Id.* at 26.) Ms. McCrimon testified that she was not aware before the visit that a gun was in her house. (*Id.* at 26, 29) According to Ms. McCrimon, Petitioner slept in the living room on the couch and stored his clothes in the hall closet. She denied telling the officers that Petitioner lived or slept in the attic or directing them to the attic. (*Id.* at 27-28.) Ms. McCrimon testified that, at the time of the search, Petitioner was working at least eight hours per day, five or six days per week. (*Id.* at 28.) Ms. McCrimon testified that she did not say anything to Switzer other than to ask why he was at the house. (*Id.* at 29.) She claimed that the attic is not a proper room, though she is trying to turn it into one. It presently is too hot in the summer and too cold in the winter for occupation. (*Id.* at 29.) She

testified that Gregory McCrimon had slept in the room a couple of times before he moved into his room downstairs. (*Id.* at 30.)

Petitioner testified that he was at work when the officers came to search his residence. (*Id.* at 31.) When Petitioner returned home, his mother and brother told him what had happened. Petitioner stated that he explained to them why the gun could not be in the house and he asked them to come with him to tell the parole officer that Petitioner had not known about the weapon. He further explained that his brother never had been involved in trouble before and was unaware that Petitioner could not be in the house where a gun was kept. (*Id.* at 32.) He testified that he had no knowledge of the existence of the gun until he returned home and learned of the results of the search. (*Id.* at 32.) Petitioner never slept in the attic room. After learning from his brother that they were trying to fix up the attic but that it still was cold and had a damaged window, Petitioner opted to sleep on the couch. He testified that he had not been up to the attic because he did not have anything stored there. (*Id.* at 33.) Petitioner strenuously denied having told Vaught that he knew about the gun. (*Id.* at 34.) Sometime after Petitioner was taken into custody, Switzer allowed Petitioner to call home. Petitioner called his brother and asked his brother to speak to Switzer, who did not want to talk and, after a few words, hung up the phone. (*Id.* at 35.)

The hearing examiner found that Switzer had done a very poor job gathering evidence of Petitioner's occupation of the attic. Nevertheless, he concluded that Petitioner had access to the attic and that Petitioner's brother had stated that he and Petitioner shared the gun. He also credited Vaught's testimony that Petitioner admitted that he knew the firearm was in the house and that it constituted a parole violation. The hearing examiner therefore found by a preponderance of the evidence that Petitioner had committed the parole violation. (*Id.* at 37-38.) Having found a parole

violation, the hearing officer stated that he had no discretion but to order a sixth-month return to custody. (*Id.* at 42.)

Petitioner filed a grievance on January 14, 2005, complaining about the fairness of his parole revocation hearing and arguing that the hearing was held one day beyond the 45 days required under MICH. DEP'T OF CORR., Director's Office Memorandum (DOM) 2004.11. (Pet., App'x K, docket #1-13.) The grievance was denied on the grounds that a violation of the 45-day rule was no longer grounds for dismissal of the violation charges. (Pet., App'x L, docket #1-14.) Following rejection of his grievance, Petitioner filed a complaint for writ of mandamus in the Ingham County Circuit Court on February 4, 2005. On July 11, 2005, the court found the motion to be without merit and that mandamus was not the proper remedy for the alleged violation. (Pet., Supp. App'x 2, docket #1-17.) Petitioner was directed that a proper challenge to the hearing procedures or decisions was under the Michigan Administrative Procedures Act, MICH. COMP. LAWS § 24.301 et seq.

On January 19, 2007, Petitioner filed a complaint for writ of habeas corpus in the Jackson County Circuit Court. The circuit court denied the petition on March 1, 2007, concluding that Petitioner had failed to demonstrate the sort of "radical defects that render a judgment absolutely void" required for issuance of a writ of habeas corpus. (Pet., Supp. App'x 3 at 2, docket #1-18.) Petitioner renewed his complaint for writ of habeas corpus in the Michigan Court of Appeals, which dismissed it for lack of jurisdiction on the grounds that an action for the extraordinary writ of habeas corpus was not a substitute for an appeal. (Pet., Supp. App'x 3, docket #1-19.) Petitioner then sought leave to appeal to the Michigan Supreme Court, which denied leave

because it was not persuaded that the question should be reviewed by the court. (Pet., Supp. App'x 4, docket #1-20.)

      II.    <u>Analysis</u>

In his amended habeas application, Petitioner contends that he was denied his right to due process under the Fifth and Fourteenth Amendments and his rights under the Ex Post Facto Clause of the Constitution. He makes the following four specific claims: (1) Petitioner was denied due process when the Michigan Parole Board (MPB) relied on false information in revoking his parole; (2) Petitioner was denied due process when MPB chairman John Rubitschun and MPB member Charles E. Braddock allowed Hearing Officer Wayne Groat to unlawfully alter and remove from the record testimony given at the parole hearing; (3) Petitioner's right to due process was denied when Groat falsified his factfinding; and (4) Petitioner's constitutional rights were violated under the Ex Post Facto Clause. U.S. CONST., art. 1, sec. 9, cl. 3.

      **A.**    **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court

of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir.

1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

### B. Due Process

Petitioner makes a variety of claims about why his due process rights were violated by the introduction of false evidence and unreasonable fact finding at his parole revocation hearing. In *Morrissey v. Brewer*, 408 U.S. 471, 481-84 (1972), the Supreme Court held that individuals threatened with the revocation of their parole possess a liberty interest that entitles them to minimal due process protections. In defining those minimal due process protections, the Supreme Court recognized two important stages in the parole revocation process – the preliminary hearing and the revocation hearing. *Id.* at 485. The Court stated that a preliminary hearing should be held promptly after the alleged parole violation or arrest to determine whether probable cause exists to hold the parolee for a revocation hearing. *Id.* at 485-87. If probable cause is found to exist, the parolee has a right to a hearing prior to a final decision on revocation by the state parole authority. *Id.* at 487-88. The minimal due process requirements at the revocation hearing stage include:

> (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.

*Id.* at 489. The Court emphasized, however, that the second stage of parole revocation should not be equated with a full criminal prosecution. *Id.* The due process requirements for a revocation hearing defined in *Morrissey* are codified in MICH. COMP. LAWS § 791.240a. Pursuant to MICH.

COMP. LAWS § 791.240a(3), petitioner was entitled to a fact-finding hearing within 45 days after he became available for return to a state correctional facility.

Because the revocation of parole is not part of a criminal prosecution, parolees are not entitled to the full panoply of rights given to defendants in criminal proceedings. *Morrissey*, 408 U.S. at 480. The process should be flexible enough to consider evidence that would not necessarily be admissible in adversary criminal proceeding such as letters, affidavits, and hearsay testimony. *Id.* at 489; *see also United States v. Froman*, No. 86-5540, 1987 WL 36965, at *2-3 (6th Cir. Apr. 6, 1987). Unlike criminal proceedings, a parolee need not be found guilty beyond a reasonable doubt before having his parole revoked; rather, the revocation of parole is proper when supported merely by reasonable grounds. *See Morrissey*, 408 U.S. at 490; *Simmons v. Hurley*, No. 95-3168, 1997 WL 14781, at *2 (7th Cir. Jan. 9, 1997).

1.  False information

Petitioner argues that he was denied due process because his parole was revoked on the basis of "false" testimony given by Switzer and Vaught. The basis for his claim is that his own witnesses should have been believed because the testimony of Switzer and Vaught was inconsistent and Switzer did not include in his report everything he testified to at the hearing. I disagree. Petitioner's own evidence demonstrates that he received a parole revocation hearing that is fully sufficient under *Morrissey*. The decision to revoke parole in this case was reasonable based upon the testimony of the parole officer and parole supervisor and the uncontested evidence that the gun was in the house, in an area to which Petitioner had access and which he appeared to have used. All of the contradictory testimony discussed in the habeas petition was presented to the hearing examiner, who was free to assess the credibility of the witnesses and make his decision accordingly.

Contrary to Petitioner's contentions, the hearing examiner was not obligated to give equal weight to conflicting testimony. The findings of the hearing examiner are entitled to a presumption of correctness, and, thus, I conclude, Petitioner has failed to rebut that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.

### 2.    45-day rule

Plaintiff next argues that his right to due process was violated when his probation violation hearing was held more than 45 days after he was returned or available for return to a state correctional facility, in violation of MICH. COMP. LAWS § 791.240a(3), which provides:

> Within 45 days after a paroled prisoner has been returned or is available for return to a state correctional facility under accusation of a parole violation . . . , the prisoner is entitled to a fact-finding hearing on the charges before 1 member of the parole board or an attorney hearings officer designated by the chairperson of the parole board.

MICH. COMP. LAWS § 791.240a(3). Plaintiff alleges that the hearing examiner admitted that 46 days had passed, but the examiner held that dismissal was not the appropriate remedy for the delayed hearing. (*See* Pet., App. A, Hrg. Tr. at 41, docket #1-3.)

Accepting that the hearing was one day late under Michigan law, that delay does not amount to a constitutional deprivation cognizable on habeas review. The court may only entertain an application for habeas relief on behalf of a person in custody pursuant to the judgment of a State court in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). A habeas petition must "state facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, RULES GOVERNING HABEAS CORPUS CASES). The federal courts have no power to intervene on the basis of a perceived error of state law. *Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *Pulley v. Harris*,

465 U.S. 37, 41 (1984). The Sixth Circuit has declared that "[f]or excellent reasons, claims that a state erred in interpreting or applying its own criminal law or procedural rules are almost always rejected as grounds for granting the writ of habeas corpus." *Wilson v. Mitchell*, 250 F.3d 388, 396 (6th Cir. 2001) (citation omitted). As a result, to the extent Petitioner's claim is based on a violation of state law, the issue is not cognizable on habeas review

Due process requires only that the final revocation hearing be held and a final determination be issued within a "reasonable time." *See Morrissey*, 408 U.S. at 488. To determine whether a delay in reaching a final determination is unreasonable, the Court must consider: (1) the length of the delay; (2) the reasons for the delay; (3) whether the parolee asserted the right, and (4) any prejudice to the parolee from the delay. *Lyons v. Ohio Adult Parole Auth.*, No. 96-3489, 1998 WL 124039, at *2-3 (6th Cir. Mar. 12, 1998) (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)). Considering these factors in light of the circumstances alleged by Petitioner, the Court finds that the forty-six-day delay between Petitioner's arrest and his revocation hearing was reasonable. Indeed, in *Morrisey*, the Supreme Court expressly noted that a "lapse of two months [between the time when a parolee is taken into custody on the parole violation warrant and the final revocation hearing is held] would not appear to be unreasonable." *Morrissey*, 408 U.S. at 488; *see also Moore v. Hofbauer*, 144 F. Supp. 2d 877, 881 (E.D. Mich. 2001) (citing *Morrissey*). Therefore, the Parole Board's alleged violation of Michigan's forty-five-day rule did not deprive Petitioner of due process. *See Moore*, 144 F. Supp. 2d at 881.

3. Incomplete record

Petitioner next alleges that the Parole Board violated Petitioner's due process rights by allowing Hearing Examiner Groat to remove portions of the audiotape from the record.

Petitioner contends that, while the audiotape of the hearing and the transcript coincide with one another, the audiotape contains "blips and pauses," suggesting that it has been edited. In addition, he alleges, the transcript does not include a notarized certification of authenticity, ostensibly in violation of state law and of 18 U.S.C. §§ 241, 401, 402, and 3691.[1]

Petitioner's claims are frivolous. Regardless of the existence of noises on the tapes, Petitioner has failed to identify the nature of any purportedly "missing" portion of the record. Instead, Petitioner's own arguments concerning the testimony at the revocation hearing are fully consistent with the transcript produced. Petitioner therefore fails to raise any legitimate question concerning the accuracy of the transcript.

In addition, regardless of whether a certification was required under Michigan law, Petitioner's request for habeas relief turns on the fundamental fairness of the procedure under the requirements of the Due Process Clause. *See Estelle*, 502 U.S. at 68. Because Petitioner raises no legitimate claim that the record was false, the fact that it was not accompanied by a certification of authenticity is irrelevant.

### C.   Ex Post Facto Clause

Petitioner alleges that the Michigan Parole Board inappropriately applied a new parole policy under the Zero Gun Tolerance Policy, which was not in effect when he signed his parole release papers. The Zero Gun Tolerance Policy was enacted on July 14, 2004, after Petitioner had been released on parole.[2] Under the Zero Gun Tolerance Policy, Petitioner is not eligible for

---

[1] The cited statutes involve the federal criminal offenses of conspiracy and criminal contempt.

[2] *See* Governor Granholm announces Zero Tolerance Policy for Parolees, Probationers involved with guns, July 14, 2004, http://www.michigan.gov/gov/0,1607,7-168-23442_21974-97314--,00.html.

parole for sixty months after he was found in possession of a gun or associating with someone possessing a firearm.

The Constitution's Ex Post Facto Clause prohibits the enactment of any law that "retroactively alter[s] the definition of crimes or increase[s] the punishment for criminal acts." *Collings v. Youngblood*, 497 U.S. 37, 43 (1990). In *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499 (1995), the Supreme Court considered whether a post-sentencing change to parole procedures constituted the type of change in the law subject to analysis under the Ex Post Facto Clause. The Court declined to adopt an interpretation of the Clause that would "forbid[ ] any legislative change that has any conceivable risk of affecting a prisoner's punishment." *Id.* at 508. Instead, the Court established a test inquiring whether a change in the law "produced a sufficient risk of increasing the measure of punishment attached to the covered crimes." *Id.* at 509. A "sufficient risk of increased punishment" involves more than "some ambiguous sort of disadvantage" to an inmate. *Id.* at 506 n.3.

Although a prisoner's release on parole is discretionary with the Parole Board in Michigan, *see* MICH. COMP. LAWS §§ 791.233e, 791.235, the Supreme Court has recognized that the "presence of discretion does not displace the protections of the Ex Post Facto Clause," because the "danger that legislatures might disfavor certain persons after the fact is present even in the parole context." *Garner v. Jones*, 529 U.S. 244, 253 (2000). The Court further noted that, "[i]t is often the case that an agency's policies and practices will indicate the manner in which it is exercising its discretion." *Id.* at 256 (citing *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996) (observing that the reasonableness of discretionary agency action can be gauged by reference to the agency's policies and practices)). The Court found that in deciding whether an administrative rule pertaining to

Georgia's parole system violated the Ex Post Facto Clause, the lower court should have considered a policy statement where it was a "formal, published statement as to how the Board intends to enforce the Rule." *Id.* at 256-57.  However, the Court explained that in the Ex Post Facto analysis, it was equally significant that,

> to the extent there inheres in ex post facto doctrine some idea of actual or constructive notice to the criminal before commission of the offense of the penalty for the transgression, . . . we can say with some assurance that where parole is concerned[,] discretion, by its very definition, is subject to changes in the manner in which it is informed and then exercised. The idea of discretion is that it has the capacity, and the obligation, to change and adapt based on experience.  New insights into the accuracy of predictions about the offense and the risk of recidivism consequent upon the offender's release, along with a complex of other factors, will inform parole decisions.

*Id.* at 253 (internal citations omitted).

First, it is not at all apparent that Petitioner's circumstances involved the retroactive application of an amendment in the law.  The MDOC paroled Petitioner on June 6, 2003. At the time of his release, Petitioner signed parole release papers containing a variety of conditions, including a prohibition on the ownership or possession of a firearm.  The release papers did not include any specific notice about the length of time a for which parole consideration would be denied if the offender violated the condition and returned to prison.  The Zero Gun Tolerance Policy was implemented on July 14, 2004.  Under the Zero Gun Tolerance Policy, if a parolee is found in possession of a gun or associating with individuals who possess guns, then the parolee will be returned to prison to continue his or her sentence for five years or for the remainder of his or her maximum sentence.[3]  Petitioner violated parole on October 22, 2004, three months after the policy had been adopted.  As a result, the policy was not retroactively applied because "the current version

---

[3]*See* Governor Granholm announces Zero Tolerance Policy for Parolees, Probationers involved with guns, July 14, 2004, http://www.michigan.gov/gov/0,1607,7-168-23442_21974-97314--,00.html.

of [Michigan]'s parole regulation in question was in effect at the time [Petitioner] engaged in the [parole violation]. Thus, [Petitioner's] rights under the Ex Post Facto Clause are not implicated, as the law did not change the legal consequences of the acts in question, which were completed after the regulation's effective date." *Leal v. Phillips*, No. 97-3537, 1998 WL 69326, at *2 (Feb. 10, 1998).

Even if the Zero Gun Tolerance Policy were to be considered a retroactive change in the law, Petitioner fails to raise a meritorious federal claim. It is clear that the controlling inquiry is whether the retroactive application of an amendment to a law or later enacted law or policy will create a sufficient risk of increasing the measure of punishment attached to a particular crime. *See Garner, 529 U.S.* at 250; *Morales*, 514 U.S. at 509; *Michael v. Ghee*, 498 F.3d 372, 381-83 (6th Cir. 2007) (the relevant inquiry is whether the new parole guidelines present a significant risk of increasing the plaintiff's amount of time actually served). If a parolee violates the Zero Gun Tolerance Policy, then the parolee is returned to prison to continue his or her sentence for five years or for the remainder of his or her maximum. Petitioner violated the Zero Gun Tolerance Policy on October 22, 2004. At that time, over six years remained on Petitioner's sentence and Petitioner's parole violation represented his third failed attempt to meet the conditions of his parole. Petitioner's allegations fail to suggest that the application of the Zero Gun Tolerance Policy will create a significant risk of increasing his punishment. Therefore, Petitioner's claim is insufficient to implicate the Ex Post Facto Clause.

**Recommended Disposition**

For the foregoing reasons, I recommend that the habeas corpus petition be summarily dismissed pursuant to Rule 4 because it lacks merit on its face. I further recommend that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).


Dated: October 29, 2008         /s/ Hugh W. Brenneman, Jr.
                                HUGH W. BRENNEMAN, JR.
                                United States Magistrate Judge


**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).